Good morning. Judge Gould was supposed to appear by video, but we have technical problems. Please be seated. We have technical problems, and therefore he is here by phone, as I understand it. Judge Gould? Yes, Judge Brezana, I'm here by phone, and thank you. And I will be presiding in the courtroom for that reason, although Judge Gould is the presiding judge for this case. We will hear the case of Michaels v. Davis this morning. We will have a half hour for each side for argument. I think we'll be pretty tough about the time, although I will give you a minute in rebuttal should you run out of your time. I would say two because it's a 30-minute calendar. And you may reserve time, but you'll have to reserve it for Thank you, Your Honor. It would be helpful to me if you go ahead and you should introduce yourself. But if you could tell me what – tell us what issues are going to be argued. That's where I was going to start. First, my name is Ben Coleman. Joining me at the council table is Michael Belter. We represent Appellant Kurt Michaels, and I will be presenting the argument today for Mr. Michaels. The issues that I was hoping to get to, and this might be overly ambitious, is I was going to start with the IAC claim regarding what's been called the POPIC note. I was then going to discuss the Miranda claim. I was going to then try to get to the failure to relieve attorney Richard Grossberg and then hope to get to some of the mitigating evidence that either was omitted or inadequately presented. And your name is Coleman, right? My name is Coleman. And beginning with that IAC claim on the POPIC note, I did want to start here because I think there's a recent Supreme Court case that's important called Buck v. Davis. And that case was decided after we submitted our opening brief, but we did rely on it heavily in our reply brief. And so I really wanted to focus on Buck. And I think Buck is very important as to the prejudice prong, as to that particular IAC claim. Before getting there, as to the deficient performance prong, below, Respondent really did not challenge that the attorneys engage in deficient performance by violating the attorney-client privilege. And the district court pretty much seemed to assume that that was the case, although it didn't render a definitive ruling in that regard. But we think that — And the district court — I mean, this is one of the claims, perhaps the most important claim, on which the district court kind of left the cause and prejudice question open. And so we're engaging on the merits, but it's not yet clear whether that's appropriate. Well, that's correct. We had a dispute about whether procedural default applied. It was our position that, first of all, the claim was adequately presented on the direct appeal because in the claim, the attorneys argued that the lawyers engaged in ineffective assistance. And then we had several arguments as to why procedural default didn't apply, including a Martinez argument, which the district court did not address and just went straight to the merits. So it's our position that, at the very least, if default is still in play, that that should be decided by the district court in the first instance under Dietrich v. Ryan. I mean, we don't think the claim is defaulted. We think it was adequately presented. But at the very least, that would be the proper procedure. And just — I'm sorry to be deflecting you, but did the district court rule as to the default? No. Not even to the default, besides the cause and prejudice? It — the district court found that it wasn't adequately presented in the direct appeal. It did. So it did say there was a default. But — So there's no point in sending that back. So we should decide that ourselves. Well, the court could decide that ourselves. We think the district court was just wrong in that regard. I mean, we think that the claim was raised. Because there would be no point in sending that back. You already decided it. Yes. Okay. All right. Go ahead. That aspect of the default, I agree with Your Honor, that you could decide that. And we think district court was wrong on that. On the merits, as to the deficient performance prong, in Strickland itself, the Supreme Court stated that there are certain ethical obligations that — and a duty of loyalty that an attorney is required to comply with, which would obviously include the attorney-client privilege. And the ABA guidelines make it very clear that the most fundamental, I guess, precept of a defense function, in both capital and non-capital cases, is maintaining the privilege. And, of course, the Supreme Court has consistently relied on the ABA guidelines as — So — but what happened here was sort of complicated, as I understand it. Because the first two lawyers were the ones responsible for giving the note to the trial judge. Correct. Under seal. And the next two lawyers, while they were still representing Mr. Michaels, you know, regularly, were — seemed to be the ones responsible for giving it to the prosecution. Is that accurate? That's correct. The initial — And your IAC claim goes to all of that. Correct. That it's just all — it was — the initial disclosure was to the trial court and the other defense lawyers in the case. And then the subsequent follow-up disclosure went to the prosecution. We think they all were — it was all ineffective assistance. It was all deficient performance to violate the privilege, to let, you know, a confidential communication to the lawyers to be divulged to the prosecution. But the California Supreme Court said that giving it to the trial court was a breach of the privilege at the time it occurred. But two years later, the California rule was at least changed in a sort of a Tarasoff way to say that they could have given that information. Well, it's our position that even under the subsequent rule, that it still would have violated the privilege because they didn't discuss the matter with Mr. Michaels beforehand. There were other measures that could have been taken before disclosure. So — but that rule didn't apply anyhow. What are the measures — what are the measures could have been taken prior to disclosure in order to maintain the security of the courtroom? Well, there are things that we do all the time as defense lawyers where you could go to the marshals or go to the court and simply say, listen, I think there's a problem with these — with the defendants. They should be separated. I can't give you the exact details, but there's need to separate these two. We think that that would be in the best course of action. And if — first see what the court will do. Perhaps the court will say, OK, I got what you're saying and we'll separate them. But there are certain steps along the way that you would take that are reasonable. But none of that would have mattered had it not been for the fact that this stuff was later unsealed and given to the prosecutor. Right? Well, correct. I mean, that's what we think — I mean, that's the real problem. It's not really giving it to the judge. Nothing happened as a result of giving it to the judge that was prejudicial. Right. And we think it was ineffective to allow it to get into the prosecution's hands. I mean, you know, both steps of the — in the process were deficient performance. All right. What about prejudice? OK. So if we get to prejudice and why I start off with Buck versus Davis, I just wanted to just briefly set out what happened in Buck, because I think Buck was a more aggravated or at least a stronger case in aggravation and where the Supreme Court found prejudice under the AEDPA standard. In Buck, the defendant shot and killed two people and shot and attempted to kill a third person. So we have multiple murders. One of the individuals that he killed was a mother, and he actually shot and killed the mother in front of her children who were begging him not to kill her. So you can only imagine the victim impact situation in that case, whereas here we had absolutely no victim impact evidence at all. The defendant in that case had prior felonies and had served prison time. Now, what happened in the future danger evidence that was allowed in that case is that the defense called a future danger expert who generally gave very favorable testimony to the defendant and said that he didn't think the defendant would be a future danger in prison. But in very brief testimony, he did state that black men are statistically more likely to be a future danger, and the defendant in that case was black. There was a brief question about it in the direct and then a brief question about it in cross, and that was it. No closing arguments about it. The jury in that case deliberated two days, returned a death verdict, and the Supreme Court held that this type of evidence, they said some toxins are deadly in small doses, that this type of evidence about future danger is so important that there was prejudice in that case. Here we have the jury deliberated for three days. But the race issue must have had a really major role there, I mean, in the sense that referring to race could have had other ramifications on the whole penalty. Well, certainly race has a special, I guess, consideration. But I do think the things that the Supreme Court said in that case are helpful, that it doesn't matter how much air time a particular issue gets in a case or how many pages of transcripts it's discussed, although in this case there was a fair amount of discussion. The entire rebuttal was about the poppic note. The prosecutor emphasized the poppic note in his closing arguments. The California Supreme Court's analysis was, well, this could have been favorable to the defense, but nothing favorable about the note was argued at all by the defense. I mean, you could, I guess, put any spin on an aggravator and somehow say, well, maybe the jury would have considered it. Well, it seemed like that in the direct, when the defense then put on Burns or one of the earlier lawyers. Duff, yes. What's his name? Charles Duff. Duff. And they did try to get him to say that this wasn't really a threat, but in fact he didn't actually say that. No. And then he was cross-examined and the prosecutor got him to say that he had never experienced anything like this in his career. And in closing argument, the prosecutor specifically said his favorite witness in the whole case was Charles Duff. I mean, this was emphasized heavily. And, you know, I think jurors, I mean, we cited a study that talked about how jurors who find that defendants will be a future danger in prison over 80% of the time vote for Duff. Whereas jurors who find that the defendant won't be a danger in prison over 80% of the time vote against the death penalty. This is a major consideration. Will this defendant harm other prisoners? And for the jury to hear that while this defendant has a capital murder charge against him, when he's got everything at stake, that he would be willing to cause serious bodily harm to his co-defendant while he's in custody facing a capital charge, jurors are going to look at that and say, this is someone who's going to be dangerous to other inmates. He's going to be dangerous to guards. And that's actually what the prosecutor specifically argued in his closing argument. And so for all those reasons, when you have a jury that deliberated this long at the penalty phase, and when you have a case that is not nearly as aggravated as other death penalty cases, where this court has found prejudice and reversed, where there were multiple murders, or there were children victims who had been sexually abused in addition to being murdered. I think that it was just an unreasonable determination by the California Supreme Court that there was no prejudice in the case. And for... All right. So let's go back to the procedural problem. Suppose we agreed with you that there's at least, you know, something significant here. What do we do then? Do we just stop the case and send it back to the district court for a determination on merit? I understand we could decide the procedural default going in point ourselves. But if we agreed with the district court about that, we would then decide the merits, or we would then send it. Detroit, first of all, is a plurality opinion. Second of all, it didn't actually decide the issue. It just decided that it was really a serious issue, essentially. Is that what we would do? What would we do? Well, I realize it is a plurality opinion. You didn't say that, by the way, but it's okay. But it's the lead opinion. I guess that's the one that... I'm not sure whether you could say which one. I think that would be the one to control. But in any event, I think there are different steps the court could take. Obviously, we'd love the court to agree with us that it was adequately raised on direct appeal. If not, we then have a series of arguments as to flaws with the California procedural default rules, whether they're independent and adequate in capital cases at this particular time, at the trigger date for the default. And that all precluded by later Supreme Court cases? I mean, the recent Supreme Court cases have held the Dixon bars okay, and another one, I forget which one. But those were non-capital cases. And the issue we have here is that in the capital context, California is one... And this was what this court said in Hoffman. California is one of the few cases that has sort of a unitary appellate process, where the same lawyers simultaneously file a direct appeal. Not quite simultaneously. But virtually. I mean, slightly after they file the opening brief. I think it's supposed to be like 30 days after the reply or something like that. They have to file the habeas. And those Supreme Court cases didn't address that particular aspect of sort of the capital regime in California. But then we also have the Martinez v. Ryan IAC of direct appeal habeas counsel that if they should have at least constitutionalized this claim and raised it as an IAC claim... I thought the Supreme Court recently held that there is no Martinez for appellate counsel. Well, it would be... I guess it would be... Well, there is IAC of appellate counsel, but Martinez would apply to the post-conviction counsel, who are the same in this case. Yes, but it only applies to IAC for post-conviction counsel as to what happened at the IAC at the Yes, but what the court, what the lawyer should have done in habeas, the habeas lawyer should have made an IAC claim as to trial counsel. As to trial counsel. You said appellate counsel, which is why I stopped you. Okay. Okay. I mean, we also have a claim that they should have raised it on direct appeal as well. But it would probably be better to have raised it. We think they did raise it in direct appeal, but it would have been they should have raised it on the first round. The Supreme Court refused to decide the IAC claims on the direct appeal in this case, right? Correct. The other ones they did, yes. Right. And, but we still have a Martinez v. Ryan claim that capital counsel should have raised this claim as a trial IAC claim in the initial habeas. So we think the plurality opinion of Dietrich suggests that at least that would go back to the district court for a determination in the first instance. Before deciding the issue. That's what I'm trying to find out. Should you do that before deciding the issue? Yes. That's what I'm trying to find out. Okay. Sure. I mean, I, well, I think Dietrich said that, I mean, like you said, it looked like this, this was a legitimate issue. So because it was a legitimate issue, we're going to send it back to the district court. I guess there needs to, perhaps there should be some type of initial analysis as to the strength of the issue before sending it back. But I think it all could be avoided because we think they did raise it on direct appeal. And so it wasn't defaulted at all. If I could move on to the Miranda claim, if the court had no other questions on this claim, it's, our initial position is that AEDPA review doesn't apply because the California Supreme Court, contrary to and in an unreasonable application of Smith versus Illinois, looked at the subsequent answers and conduct during the interrogation to arrive at its determination about the invocation. And the Supreme Court made it clear in Smith, and this court has made it clear in several cases over the last decade that you can't do that. That is wrong. But isn't Smith a case where there was an unambiguous claim, unlike the claim here which is ambiguous? Our position is that it's nonambiguous. But if the court finds that it is ambiguous Right. Then Smith doesn't apply. Well, I still think that Smith does apply. No. You can't use post-request evidence to rebut an unambiguous request. But you can use it to interpret an unambiguous request. Can you do that? An ambiguous request. An ambiguous request. I think that under this court's case law, in Rodriguez Is that going to be good enough under Redbird? Well, that's why I think that I think under Smith versus Illinois, they could I know, but we may differ on that. Okay. All right. But the other problem is what's the it? In other words, what is, as I understand it, the any waiver of counsel was certainly ambiguous, at best. It was, although our position is that they created the ambiguity because they cut them off. Okay. So then you have him saying, then they ask him a question and he says, okay. And then they say, you can stop. You can stop any question. And he says, okay, that, something like that. And the California Supreme Court says, well, that was only with respect to the particular question. Why did you just accept that? We do. We say if that's the case, if that's the way the court interprets it, then they It's still clearly an unreasonable determination because the question was, give your side of asking about the murder of Joanne Clemens. And so then he selectively invoked his right as to the murder of Joanne Clemens. But then they just proceeded to ask him about the murder of Joanne Clemens. That was what the whole interrogation was about. So if that is if that is the interpretation that I mean. So what the California Supreme Court did wrong essentially was to think that he was only selectively invoking it. That was the end of the story. But it's not the end of the story. Correct. Because he selectively invoked as to the Joanne Clemens murder. And therefore, the rest of the interrogation violated Miranda. And that's a that's a violation of clearly established. All right. So what about prejudice on this? Okay. We think I'll start with the penalty. Most importantly, the the the error was not harmless as to the penalty because the penalty relied on in a closing. It said it was one of the most aggravated and horrible parts of the case. It was one of the he played the tape repeatedly. He also was at the penalty phase closing. He also was allowed to get in. Mr. Michael's bragging about how he had killed all these other people, which was totally untrue as part of the penalty phase presentation with with the confession. So I mean, I don't respond has barely addressed the penalty phase. Prejudice as to the penalty phase as for all those reasons. And again, when you look at the closest of the verdict with a three day jury deliberation period of time at the penalty, we really have no idea what went on those three days. But we don't. But it's some agency. But the courts, I mean, this court and the Supreme Court have have mentioned that in a variety of cases as is showing that a case was close. And when you just look at the overall balance of factors in the case, it's our position that the error was not harmless as to the penalty as to the penalty phase. And that's really our most important concern as to the guilt phase. It's our position that the at the very least as to the special circumstances, the the error was harmless because he confessed to the special circumstances. And the prosecutor argued during the guilt phase closing again, heavily relying on the confession that he confessed to all the special circumstances. And of course, the entire nature of the defense was affected by the admission of the confession. They were stuck with the confession. If the confession had been kept out, there may have been ways to argue at the very least a lesser degree of murder as a second degree murder or perhaps manslaughter because this was heat of passion or something like that. But when they were stuck with the confession, you know, that's. But there was a lot of other evidence was the problem. There were all these people who heard him say that he was going to go commit this murder and hear him say afterwards that he did and so on. So they they confess. It seems to me you're on stronger ground with regard to some of the details used during the penalty phase. But as to whether he actually committed the murder, there was plenty there. Yeah, I didn't. I understand the court's point. And that's why I was saying at the very least, perhaps there would be to vacate the special circumstances or the first degree versus second degree murder. But we're mostly focused on the penalty. Right. And that's our main concern. And that's really where we think the confession was prejudicial, was asked to the penalty. And if there are no other questions on that, I will proceed to the failure to relieve Attorney Richard Grossberg. I think there does need to be a little bit of a background as to what transpired in the case before we get to Grossberg. The first two lawyers that were appointed, we had already talked about Charles Duff and James Burns. Neither were qualified Capitol counsel. Mr. Michaels actually had no problem with Mr. Duff and wanted him to stay on the case. But Mr. Duff got off on his own accord for personal reasons. Mr. Burns, on the other hand, was saying things in court such as, I don't have to do any penalty phase workup until we find out what the guilt verdict is. And then I can take care of my penalty investigation after the guilt verdict. Which is clearly IAC. And eventually, and these are the lawyers that, of course, started the violation of attorney-client privilege. But eventually the judge removes, rightly so, removes Burns as well. So two new lawyers are substituted in in August of 1989 after the case has been pending for about 10 months or so. So now they've got to start over again, but the judge wants to get the case to trial. Mark Chambers is appointed. He's a relatively inexperienced lawyer, not Capitol qualified. At best, under the county system, qualified for low-level felonies. And despite the fact that Mr. Chambers is seeking to confer with Capitol counsel, the court says, I'm going to appoint Richard Roseburg. The first mistake in the analysis is the California Supreme Court says that he was a Capitol qualified Class 6 attorney. That's just not true. He was a Class 5 attorney. He wasn't Class 6. So for that reason alone, there was an unreasonable determination of fact there. The judge appoints Mr. Grosberg, although Mr. Grosberg is just getting out of the hospital for hip replacement surgery, which is a horrible idea because he wants the case to go to trial relatively soon. And it's a lot of work in a Capitol case. And Grosberg himself admits that weeks go by before he even meets Mr. Michaels because he can't physically go to the jail to meet him. So you can only imagine a client who is being told he's going to go to trial very soon. He can't even confer with the with the lawyer because the lawyer is physically unable to do so for weeks. And nothing's getting done. So you can understand his concern and why he wants to. As things were getting done, he was studying the case. He was the things that were being done. I guess I should just get to the heart of the matter at this point are and the only thing the California Supreme Court or the district court found is that he attended parts of the co-defendants trial, which is a good thing to do. But is sort of just the tip of the iceberg for when you have a penalty phase potentially looming. He worked to improve his jail conditions with not really clear what it is that he did. But again, a good thing to do, but not complying with what you have to do under ABA guidelines and Supreme Court precedent. And there's a dispute about whether he interviewed two or perhaps three or four witnesses or had an investigator went through. I mean, did a very detailed job on this and went through the. Billing sheets and said that actually a fair number of people were interviewed either by him or by investigators. Right. Well, the billing sheets, they reflect attempts to interview Valinda Davis, which didn't go well. Christina Clemens, who does ultimately testify at the trial. And then there there are two penalty type witnesses. One is Steve Waltzman, who did testify at the penalty phase. And another is Michael Brohammer, who the prosecution called it the penalty phase. That's it. Those are when the sum total of the billing records reflects that. But Grossberg says he couldn't talk to him because he wouldn't talk to him. Well, and the ABA guy. Well, I'm not sure why Mr. Michaels was preventing him from going out and interviewing witnesses. Michaels wouldn't talk to him. Michaels wasn't giving him any leads. And Michaels wasn't talking to him about the confession. And Michaels was. Right. Even assuming that's all the case, the Supreme Court has made it clear over and over again that this is fairly standard in capital cases, that you have difficult clients. And that's not an excuse that the ABA makes that guidelines make that clear as well. You can't just blame it on the on the client and say, well, he's not helpful. For example, I think in Porter v. McCollum, which is Supreme Court case we cited and also in Rompilla, the defense, the defendants were antagonistic to the lawyers, were not helping at all. And the Supreme Court still said that's not an excuse. You have to go out. You have to search the records. You have to do your own investigation. But you can't talk to somebody who won't talk to you. I mean, in other words, insofar as what he didn't do was depend on Mr. Michaels, he couldn't do it. Well, Mr. Michaels would talk to Mr. Chambers and he could have gotten the information from Mr. Chambers and gone about it that way. I still think he could have done it. And Grosberg himself. Are you depending, therefore, on an ineffectiveness determination or on the breakdown notion or both? Both. I mean, it's our position that under ABA guidelines and Supreme Court precedent, he wasn't engaging effectively. But even if the court thinks that he was, that there was a breakdown in the relationship. And that's what Grosberg himself and Chambers are both telling the judge at the time of these hearings. But the judge says and the California Supreme Court says and the district court says it's released largely because of Michaels himself. The breakdown part. The blame is mostly on Michaels. But Grosberg himself is saying, listen, I can't rise to the occasion. I haven't complied with certain things that I need to do that I should have been doing. He's admitting that he's at least contributing to the problem. And he's blaming Chambers. And he's blaming Chambers. But with all those things going on. Can I ask a question? Because you're running short. OK. All right. Suppose we agreed with some of all of this. Where does that lead? It leads to the FREDA determination being an invalid one. Is there a Supreme Court law that says that? There. Well, I believe that there's a Supreme Court law that says you can't be forced to have an ineffective attorney. There there may not be a Supreme Court case that says that if you then go for FREDA, that that's an invalid FREDA waiver. We have law on that. But the Ninth Circuit has law on that. And it's our position that the California Supreme Court erroneously interpreted the U.S. Supreme Court cases on effectiveness. Once you make that determination based on U.S. Supreme Court case law, then AEDPA goes away because they've.  Well, I think the court at that point is free to then evaluate under its own case law, the validity of the FREDA waiver. If if the analysis of the California Supreme Court includes an analysis on effectiveness that is contrary to an unreasonable application of the U.S. Supreme Court cases, then it's kind of like in a in a IAC claim, for example, there are two prongs. Let's say as to the first prong, the the California Supreme Court engages in a has a defective analysis under U.S. Supreme Court case law, then this court at the second prong is free to review the second prong under its own case. Yeah, but this isn't exactly a second prong. Anyway, one last question and we'll give a couple minutes. I think you said the fourth thing you were going to talk about was the. Missing evidence. I'm sorry, what? The missing mitigation. Right. Which depends on this sort of elephant in the room, which is can you have IAC for advisory counsel? Correct. Do you have anything useful to say about that? Other than the Supreme Court has never said so. Right. The closest thing we think from the Supreme Court is Porter versus McCollum. Well, that's not very close at all because they were in fact at the point that they were claimed to be in effect. Correct. So here we have this really bizarre situation where he was never actually appointed, but he was running the operation. But Mr. Michaels, presumably, I mean, what bothers me in terms of the theory behind ineffective counsel, especially in penalty phases, that usually the when you have an appointed counsel, as you were just saying before, it's the responsibility to do things even if the client doesn't want him to. But here, that's not the case. The client is at least empowered to say, I don't want you to do that or I insist that you do that. So the things that he didn't do, how can one hold him responsible for them when Michaels could have just done it? Well, that is true, although Chambers submitted a declaration saying he made all the decisions. I understand that, but he didn't have to. Michaels could have said, I insist you put my mother on and ask her why she beat me. And bring out that she beat me. What she couldn't have done if Chambers was actually the appointed lawyer. Well, and that's why we've obviously focused so much on the failure to relieve the attorney. And we've argued that, you know, for example, that that one of the remedies the court can say is if he should have, if the Faretta waiver was defective because he didn't have proper counsel, that you can look at as a remedy, IAC of the advisory council. Okay. Thank you. And we'll give you two minutes. Good morning, Your Honors. May it please the court. Mike Murphy on behalf of the warden. I guess I'll address these in reverse order, but I'll be happy to take any questions on any of the issues. I agree with the suggestion that the last issue addressed by counsel, the IAC of advisory council claims really are a dead end, given that there's no Supreme Court case that allows such a claim. They haven't identified that as a right. It's just that this is such an unusual set of circumstances. I mean, where every step along the way, I mean, it appears that the only reason he went Faretta was essentially to to put Grossberg in the back seat, which she did, and that Chambers was functioning as a lawyer, and he meant him to be functioning as the lawyer. So in one level, it's sort of a technicality. It's a very bizarre situation. Right. And I agree that this is somewhat of an unusual case, and there's a thread that goes throughout this case, and I think it's this. Mr. Michaels is the common denominator for the differences that occur in this case, and I think we see it in the interview with the police. We see it with his interactions with the court and his handling of counsel. And what I'm getting at is Mr. Michaels is a very confident, aggressive, assertive defendant, and you can see that in his language with the court, the things that he does, he doesn't take no for an answer. So kind of even getting back, I'll dovetail this into the Miranda issue, because it makes this point. At the very beginning of the interview, when they ask him who he is, and they're just introducing themselves and saying, we've talked to a lot of people, and we kind of know what's going on. His first response is, so you found out I'm a mental case. And there's laughter in parentheses behind that statement. He starts right off in a position of full engagement with the police officer on his own terms. He's not shy, he's not submissive in that sense. So we know he's joking, and to some degree in control of this conversation, right from the beginning. And then there's, of course, the reading of the Miranda rights, which is proper. There's his clear, sure, no problem, is his answer to whether he's going to answer their questions. Again, those words exude confidence, awareness of a situation. He's not like, well, okay, or, you know, it wasn't silence. It was sure, no problem. And then they ask him, so do you know why you're here? And he comes right out with, yeah, murder. I'm here for murder. And well, who? And he tells them, you know, Joanne Clemens. And well, what happened? Then that's when he says, well, maybe I shouldn't have found out. Are we now talking about the Miranda issue? Because you kind of jumped around. I'm sorry. Let's talk about the Miranda. Okay. But then he says, okay, that one. And the California Supreme Court says that he was selectively invoking his Miranda rights as to particular questions at that point. It then stops. It doesn't go on and say, well, what was the question? And it acts as if that's not good enough. But it is good enough. And the question becomes, why don't, the last question was, what's your side of the story? What happened? And that's when he says, I don't know if I should without an attorney. And then he says, they go on and they say, if you don't want to answer that particular question, you can stop at any time. And he says, okay, that one. So he has now said he's not going to answer. Well, what's your side of the story? What happened? Well, why isn't that the end of the story at that point? As to anything that has to do with what's your side of the story? What happened? I understand that reading. I, I. That's not my reading. It's the California Supreme Court's reading. Well, what the California Supreme Court also said, and they introduced this conversation by saying that the defendant was arguing, Michaels was arguing, that the statement, okay, that one, was a request for counsel. And it was an unequivocal assertion of the right to silence. The next statement is, we disagree. So. Right. It's not an overall right to silence. And then what do they say next? Well, right. And what they say next is what you have indicated. It implies, his response, or it implies a refusal to answer a particular question. They speculate, perhaps, the question asking, what was your side of the story? What happened? And then they seem to assume that that's not a Miranda problem, because they don't say anything more about it. But, of course, it is a Miranda problem. Well, here's my answer to that question. I, they go on to describe a little more what happened. What they say is, and I think this is the important part, they say, just for full content here, where I picked, where I left off, where he said, what's your side of the, the Supreme Court said, perhaps, he was responding to the question, what's your side of the story? The Supreme Court then says, the defendant did not assert a right to refuse to answer any question, ask that the question come to a halt, or request counsel. Instead, he was showing that he knew he could refuse to answer any and all questions, and would exercise this on a case-by-case basis. I think that's the important finding there, which is he was demonstrating his awareness and understanding of his Miranda rights. And this ties into what I was trying to get at before with Mr. Michaels, is he's not a guy, he is clearly engaging in some banter with these police officers. It's unquestionable, given the language he uses and the laughter. And my point is, I believe this finding by the Supreme Court, when read in toto, is simply a finding that, broadly speaking, this was not a request for counsel. It was not a request to remain silent. He was demonstrating in his way, I understand my rights. I didn't want to answer the last question. I'm sorry. But it was an assertion that he didn't want to answer the last question. And communication is very difficult. And I think we're, I understand that interpretation looking just at the words, but I know this court knows, we all know, communication is much more, and there's much more of it to in-person interaction, demeanor, tone, context. And that's why I started at the beginning. This is only moments after he said, sure, I've got no problem talking to you, after he waved. But then he balked. I mean, he balked when they said, he said, murder. And they said, what's your side of the story? Then he starts talking about a lawyer. And then he says, I don't want to answer the question. And ultimately, I guess, the context we have to evaluate this in is, under Supreme Court precedent, was there an unambiguous, unequivocal assertion of the right? And more importantly, was the California Supreme Court reasonable in looking at the entire record? And was that a reasonable? The California Supreme Court never really analyzed the question that it identified. It identified the fact that he seemed to be saying he didn't want to answer the last question. And then he does, they don't do anything with it. And Your Honor, I think that's because, like I say, they were speculating about that in a literal sense. But they don't have to speculate. I mean, that one is the last. I mean, they just asked him a question. What's your side of the story? What happened? And he says, responds to it. I don't know if I should without an attorney. And then they tell him this stuff. I don't want to answer any particular question. You can stop at any time. He says, okay, that one. It's all completely in context. And we can't ignore the laughter. We can't ignore the original joking with the police officers. And we can't ignore that the officer immediately after that said, look, we just want to make sure you understand. He said, okay, I appreciate it. And then invited the police officers to tell him what they knew and engaged in a conversation. And because this was initially ambiguous, we get to consider that whole context. It's reasonable to do that. Well, what's initially ambiguous as to that problem, i.e., the question, I don't want to answer that question. Well, the language, okay, that one is just inherently needs to be given meaning by its surrounding context. It's not a statement of, I don't want to talk anymore. I'm not going to talk. So we need to look at... had a reasonable basis for interpreting this interchange as being a claim solely that he knew that he had the selective right to answer questions. To be reasonable, we need a reason. How do you take this conversation and find a reason how the court could find that? What in the conversation gives us a reason? Well, I think just the interchange between the officers and Mr. Michael. So the officer had just said, indicated to the defendant that if there was any questioning he didn't want to answer, he could stop at any time. And then it said... So your position is when he said, yes, that one, that was only an example of him accepting the police officer's statement that he could stop at any time. I think that's a fair characterization. Yes. Thank you. Yes. And... And that's a reasonable interpretation by the California Supreme Court of Miranda. Of the facts in this case, yes. And I would add to that, the trial court who listened to the recording of it made the factual finding that Mr. Michaels was appearing to be, in the trial court's words, engaging in banter or fencing with... Do we have the recording? I don't believe, I looked, and I don't believe that was ever offered to the district court. I don't think it's in the federal court record. No. Doesn't it have to be? Well, that'd be the, I think, the petitioner's opportunity to place that before the court if he wanted to. I don't know that it has to be. Um, in addition to that finding, the trial court, because I heard my colleague indicate that Mr. Michaels was cut off during the questioning. I disagree with that. There's no indication, there's no evidence in the record, either in the transcript or otherwise, to indicate that he was cut off. And the trial judge made a finding that Mr. Michaels, at that point, appeared to be laughing and just died off in his statement about... Where in the record are these findings by the, you're not talking about the district court, you're talking about the trial court. The trial court, right. In supplemental excerpts of record, page 155 to 156, you will find these findings by the trial court. We added those in our supplemental excerpts, again, at 155 to 156. If there were a problem with this confession, do you continue to maintain that there was no prejudice? Yes, Your Honor. What about at the penalty phase? Where there were things, where apparently it was played more than once? What? I'm sorry. Was the confession played at the penalty phase? I believe it was. More than once? I don't know if it was played more than once. I'm sorry. But isn't there material in the confession that was relied on in the penalty phase? Like you said, it was a contract killer and so on. Yes. I mean, obviously, that was there. And that wasn't anywhere else, particularly. There was references in his toolbox to some of the devil worship and other... There's a hit list somewhere, but it sort of ties it all together. So it seems to me that it was pretty important in penalty phase, whatever one thinks elsewhere. Well, I don't... Obviously, it was there and it was an important piece of evidence. Our position is, though, that when you add all of the evidence from the guilt phase and the additional evidence, aggravating evidence at the penalty phase, and we're talking about armed robberies in the past, other instances of threatened violence with weapons over a period of years, and really the brutal nature, the up-close, brutal nature of stabbing someone in their sleep, you had a lot of evidence that Mr. Michael's confession, for the most part, I'm not going to say every single detail, but for the most part, was simply cooperative of or cumulative of. And I don't think that it had a substantial impact on what the jury did in light of all of the other evidence, both of the circumstances... Do you want to talk about the pop-up note? Absolutely. I would first, I guess, point out I disagree. I mean, this was not properly presented to the State court. It was raised in the direct appeal as a just an evidentiary issue. But there was a mention of ineffective assistance. The – I saw the mention. It wasn't – I put it this way. It wasn't fairly presented as a Federal issue to the State court, and we stand by that. Because no case was cited. I mean, there was a mention of ineffective assistance. Yeah, it wasn't developed. It wasn't a developed argument. It wasn't fairly presented. But, I mean, the development of it is it was ineffective because it was a breach of the attorney-client privilege. So there was a complete overlap, or a pretty complete overlap, maybe not 100 percent. But there wasn't a whole lot more to say on the merits than was already being said as part of the attorney-client privilege argument. Well, there wouldn't have been an opportunity to address performance aspect. I mean, I agree it kind of dovetails with the prejudice aspect. Right. So, therefore, by saying IAC and knowing what it was, because it was a whole long story about the breach of loyalty, I mean, it wasn't any mystery to anybody what was being said. Well, even if the claims kind of overlap, it's still incumbent upon a defendant to fairly present it and identify it as an attorney-client. Well, I understand. They did identify it. And the question is what would they have done to present it other than what they did, which is to say he breached the attorney-client privilege. He's told that they collectively, all four of them collectively in sequence, first gave the information to the judge and then gave it to the prosecutor. I mean, that's the essence of it. There's nothing more to be said about it. So what would you have said if you, what would the elaboration have been? Well, it would have been more along the lines of what you said. They did not identify each. They didn't address the conduct of the different lawyers. In fact, my reading of the state court record, they only assert IEC with respect to the initial disclosure to the trial court. They never, in fact, Mr. Michaels' petitioner brief before this court indicated that they gave it to the prosecutor at that initial hearing. They didn't. Well, of course, they had a bit of a problem there because they were the ones who did it. I'm sorry? No, I guess not at the appeal. They didn't do it. But then there's a Martinez claim. That is that it should have been raised initially as ineffective assistance by the initial Habley's counsel, and it wasn't. Right. And our position is because it wouldn't have been successful. They cannot show prejudice. And then now we get to... All right. So therefore, you're not really, in your view, the procedural default or absence thereof doesn't really matter. Well, no, it matters. Because it forecloses addressing this claim on the merits. But at the same time, I have to note that if the court does get to the merits for a similar reason, that is lack of prejudice and lack of performance prong, they're not entitled to relief. What's the lack of performance prong? I mean, whatever one may think of giving the note to the judge, is there any doubt that letting it get to the prosecutor is something no lawyer in his right mind should have done? I don't know that I'm willing to categorically say that. I think the important part here, obviously, was the fact that it went into evidence. I mean, I will concede... It had to get into evidence. It got into evidence because it got to the prosecutor. It had to get to the prosecutor because they unsealed some sealed material without... And for some reason, let the prosecutor get it, either accidentally or as a terrible misjudgment. I don't know what else. It got into evidence because the trial judge made a ruling on it. I think it's important to remember too, but... Well, the ruling... The only thing I've seen in the record so far, and maybe you can tell me there's more, is that there were two discussions of the sealed material. And I think it was Grossberg said, well, I want to look at it first. And then they have another hearing. And by that time, or a discussion. And by that time, the prosecutor has already seen this note. And why, it's impossible to tell. But there was some discussion about this is not... You know, this is only for you to see. It's not to be used for anything. And then it gets used. And I don't know what that was all about. I mean, the rest of it, I don't know. I haven't traced it through to find out how it actually got into evidence. I don't think the record is crystal clear on all the goings-ons with how the note got dispersed. I agree with your characterization of what you just said. There were a couple of transcribed on the record discussions with the court and counsel, new counsel, about getting this note. My understanding, at least initially, is they did not know what the contents of the note were. The prosecutor... They should have, right? Well, I mean... They shouldn't be handing things over they hadn't seen or didn't evaluate. Yeah, I'm not going to argue with you on that, you know. But the bottom line is there was an agreement to release the note to both parties. And to be honest, Your Honor, at that time, if they were confident... And, you know, one of the findings in this case by the Supreme Court, the California Supreme Court, was that this evidence should not have been allowed because of attorney-client privilege. Well, why would it be IAC then if the counsel, the attorneys could be confident that, look, this isn't going to be used against our client because it can't be. Because we have an evidentiary rule that says this will not be admitted against them. So that has to factor in when you're considering their performance aspect in protecting Mr. Michaels from prejudice at a trial. If those initial attorneys felt, or the ones that got it released, they would have a rational basis. But what they said was that it was a violation of attorney-client privilege, not that it was protected by attorney-client privilege. Giving to the judge was a violation of attorney-client privilege. Now it's in the hands of a third party. It's no longer between the attorney and the client. So what's the basis for not admitting it? Well, I believe the finding was that it was a violation of evidence code for the trial judge to admit it at trial. California 954, I think it is, has a privilege for, you know, privileged information cannot be admitted in evidence. They found that was privileged information. It was judicial error under the evidence code to allow that to come in. And the attorneys could have rightly felt confident in that rule being applied, you know, properly in this case. Did they object to the time? Yes. Yes. Yes. And it was only used, just to add, to finish this topic, this was offered in response to Mr. Michaels' assertion at the penalty phase that he was not violent and he was not a bully. And it was limited to that use. That's why it was only offered in rebuttal. It wasn't allowed in the case in chief in the penalty phase. And the district court properly found that it was, the prosecutor was true to that purpose. And it was not. And what's the pertinence of that for this purpose? I'm sorry? How is that pertinent to either the IAC or the prejudice issue? It seems to make the prejudice issue more prejudicial. Well, I think it's, it goes to the prejudice issue because it demonstrates that it was not something that was used as aggravating evidence. They wanted to put it in, but the judge didn't let them. So now when they had the opportunity as rebuttal, they did put it in and it was the last thing they did. And he did it with three witnesses. And then they had his lawyer testify. And his lawyer said it was a threat. And then he said, the prosecutor says he's my favorite witness. So it certainly sounds like it got a fair amount of, it was the last thing they heard. It was fairly emphasized. And it went to an issue that really nothing else went to, which is future dangerousness. Right. Well, it went to his claim about his character for violence. And I agree that the only reason this was in the rebuttal was because it wasn't going to be let in until Mr. Michaels opened the door. But the point is that the prosecution thought it was important from the outset because they were trying to get it in to begin with. Sure, sure. And when you look at this, and I think it's important, you know, it's one thing to focus on what happened with this instance, but we have to look at all the other evidence that was admitted. And this was never characterized as aggravating evidence. We have significant other aggravating evidence. And we have significant circumstances of the offense in this case that can't be ignored when looking at the relative impact of this type of evidence. Do you want to address the counsel issues? Or anything else? I'm sorry, I didn't hear the first. Well, let me ask you the same procedural questions I was asking before. If we thought that the issues about the pop-up note were at least colorable, I mean, fairly colorable, and we want to know the answer to the Martinez question. How do we proceed? Do we decide the question? I mean, you kind of invite us to decide the issues. I'm not super comfortable deciding issues that we don't know whether they're properly before us. But that's what the district court did. And if we're just reviewing what the district court did, we would just go and decide it on the merits. Or what? What should we do at that point? Well, I mean, we can deny it on the merits. I understand that. I suppose we think it's at least a serious question. Right. Then the procedural issue needs to be dealt with head-on. My position would be this court can do it. For us to decide the Martinez question? The Martinez question? Yes. On the basis of no prejudice, yes. That would be my position. However, if this court feels that there needs to be more development on that, then I agree. It should go to the district court. But my initial position is, based on this record... But no one's briefed the Martinez issue before us. You haven't. Right. But we have before us in the record the information that would be relevant to the Martinez issue. Just wanted to sort of fly blind. Well, no. We'd be happy to brief that issue if the court's inclined to go there. But I'm not going to advocate strongly one way or the other. This court obviously can do either one. It's a funny business because I understand why the district court does this, and I've advocated doing it. But on the other hand, it leaves us at a strange position because I'm uncomfortable writing a precedential decision that could have impact on other cases with regard to something that we don't know whether it's properly before us or not. So we kind of have a hard problem. And in either direction, I'm uncomfortable writing it. I mean, if we decided this pop-up note wasn't a problem, we'd have to say some on the merits. It's an unusual enough issue that we're going to say some things that haven't necessarily been discussed before, and it's going to be a precedential opinion, even if the case isn't properly before us. Well, I appreciate those concerns. And I think with those concerns, I wouldn't have any problem having the district court look at this in the first instance. However, my first position still is here that it was properly denied. We don't need to resolve the procedural bar, and it can be denied. You were going to talk about the council issue. Right. The Grossberg, is that the one we were? Yes. Yes. Well, whatever, whatever you think is right. I did want to address the points he made, and he talked about Mr. Grossberg. This ties in with kind of what I was saying before. We have Mr. Michaels, a fairly unique defendant in the sense that he wasn't afraid to drive the train with whatever we were talking about here. And he was clearly driving the council train. He articulated his positions to the court. The California Supreme Court, and this is the heart of the matter, right? Was their decision reasonable? They reasonably found that to the extent there's a breakdown in the relationship here, this is the doing of Mr. Michaels. And the district court agreed with that. The trial court made that kind of finding too. The trial court also made findings that Mr. Grossberg was performing as a competent attorney in this case, and those are entitled to deference. There's information in the record that supports that cited by the district court here. He sure wasn't doing a lot. Well, this is hindsight 30 years later at a case that we had a confession in. And the question is, obviously you're not suggesting this, but we don't just do things to do things. Council are allowed to make reasonable, informed judgments about how to use the resources they have. And there was no question that Mr. Grossberg was doing this. The problem was the conflict between Chambers and Mr. Michaels on one side and Mr. Grossberg. Mr. Chambers said later in his habeas affidavit, as I remember, as to what actually happened at trial, that there were several things he would have done had he had time to do them. Right. But he didn't have time to do them. The not time to do them is at least fairly attributable to the period when Grossberg was lead counsel, no? I.e. things that weren't done then, like investigating the mother and the childhood upbringing and so on. And then there were several other things that I can't remember now what they were that he said I would have done it except there was no time. Well, I don't think we can say for sure what the reason for any particular failing was or a decision to do one thing or the other. The trial court set certain time limits. There were resource limits because this was an appointed case and that was mentioned in the record. Mr. Grossberg might have had a whole different approach to this case that wouldn't have required certain things that Mr. Chambers wanted to do. I mean, to hold our hat on that would, I think, require assumptions about a lot of different things regarding what people were deciding to do rightfully as in their role as advocates. All we can look at is, you know, what was done, what was failed to be done with respect to representation. We can't even say it a trial because... The time that Mr. Grossberg was relieved, wasn't relieved, or when they went for RETA, how long was that before the scheduled trial? I believe it was, I have it in my brief, I want to say 60 to 90 days. Not before the actual trial, but before the then scheduled trial. Okay, I believe that was it. 60, I have it in here. I know the actual time was about 100 days. That sticks out in my mind. The scheduled time was, my best guess is 60, 70, 80 days out. By that point, as I understand it, no one had spoken to the mother, right? No one had spoken to the sister. I don't know. I know no one had talked to the mother. I don't know, but I don't think so. And a lot of the problem later was that the mother was allowed to portray this scene of being a wonderful mother. And there is some material in the psychiatric report suggesting she wasn't such a wonderful mother, but nothing was actually done with her, about her, as I understand it. Although this was pretty close to trial already. Yes, I mean, I don't know what we can make of that, if anything. She was talked to by Mr. Chambers, and he even indicated she was not forthcoming with him. She was talked to by Mr. Chambers before, while he was still appointed counsel? No, I can't. I don't remember when. I'm not sure. Yeah. Obviously, he was Mr. Michael's mother and presumably accessible if he wanted him to be to his lawyers at any time. I see my time's up, Your Honor. Okay, thank you very much. Thank you for your argument. Mr. Coleman, two minutes. Okay. On this last issue about Grossberg, my recollection is that there's a trial set for February, I think it's 20th of 1990. And then I believe, but I think everyone's going to assume that that's going to get continued, because nothing has been done. And I believe then he goes pro per when finally there's a denial of relieving Grossberg. It's either at the end of January or the beginning of February. So we're just a few weeks away from the trial at that point. The other part of that, by the way, that you didn't address, is that the trial judge said a little vaguely during that hearing, well, if you want me to switch the order and make Chambers lead counsel, you know, I'll consider it or I'll do it or something like that. Why doesn't that undermine most of the problem? Why doesn't that solve it? If you wanted Chambers, yes. Well, I mean, first of all, Chambers isn't qualified to be the lead counsel. And I know there was a discussion, well, what's lead counsel? It doesn't really matter. It does. And the ABA guidelines make that clear. There needs to be a lead counsel who's experienced in capital cases. Now, Grossberg wasn't either, but at least he had more experience than Chambers. And then there's an associate counsel. And those are the guidelines and procedures that the Supreme Court has found should guide the analysis. Is it your position that a death penalty case should have at least two attorneys as a matter of constitutional law? It is only required by federal statute and by the ABA guidelines. I don't know that the Supreme Court itself has ever said that. But I do believe that if you're given an ineffective assistance, if you're given an ineffective lawyer, you have the right to a new lawyer. And one of the things that counsel said, well, the trial court said he was performing effectively. But the trial court is hearing not only from Mr. Michaels, but from Chambers, that no investigation has been done. There's only been two witnesses that have been spoken to. At that point, the judge should be saying, well, is that true, Mr. Grossberg? You know, you need to be doing more than interviewing two witnesses in a death penalty case when trial is set for three weeks out. What's going on? Why haven't you interviewed more witnesses? Are they lying about this? And the trial court does nothing. It's just they complain that no investigation has been done. And he ignores it. And just basically says, well, I know that he's been sitting and watching the co-defendant's trial at different parts of the trial. That's not good enough under the ABA guidelines and the Supreme Court case law. If you're going to really address the problem, you have to do an adequate inquiry. And the judge had to inquire. They're saying you're not investigating witnesses, interviewing witnesses. Are you? Are you not? And none of that is done. So what you're left with are the representations. And Grossberg's not denying it. Grossberg's not saying, no, they're lying. I'm interviewing witnesses day and night. If the lawyer, the co-counsel, and the defendant are both saying no one's being interviewed, that's it. There's no counter-representation. And the judge does nothing other than just says, well, he's staying on the case. I'm not going to relieve him. OK. Thank you very much for your arguments, both of you. The case of Michaels v. Davis is submitted. And we are adjourned. Thank you.
judges: Gould, Berzon, Bea